IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Martin E. Grable, | : | |
| Plaintiff | : | Civil Action 2:10-cv-707 |
| v. | : | Judge Frost |
| Commissioner of Social Security, | : | Magistrate Judge Abel |
| Defendant | : | |

**REPORT AND RECOMMENDATION**

Plaintiff Martin E. Grable brings this action under 42 U.S.C. §405(g) for review of a final decision of the Commissioner of Social Security denying his application for disability insurance benefits and supplemental security income. This case is now before the Magistrate Judge for a report and recommendation on the disposition of this matter.

**Summary of Issues**.  Plaintiff Grable filed an application for disability insurance benefits and supplemental security income in September 2005, alleging that he became disabled in May 2004, at age 37, by high blood pressure, migraines, mood swings, anxiety, and depression.  The administrative law judge ("ALJ") found that Grable retains the ability to perform past light unskilled work as a wire harness assembler.  Grable argues that the decision of the Commissioner denying benefits should be reversed because the ALJ improperly disregarded the opinions of two physicians, failed to accurately portray Grable's limitations, provided the testifying vocational expert with incorrect definitions of "moderate" impairment,

and improperly refused to hold a supplemental hearing.

**Procedural History**.  Plaintiff Martin E. Grable filed his application for disability insurance benefits and supplemental security income on September 15, 2005, alleging that he became disabled on May 15, 2004 by high blood pressure, migraines, mood swings, anxiety, and depression.  (R. 15, 38.)  The application was denied initially and upon reconsideration.  Grable sought a *de novo* hearing before an administrative law judge.  On May 13, 2008, an administrative law judge hearing at which Grable, represented by counsel, appeared and testified.  (R. 777.)  A vocational expert testified at the hearing.  On October 15, 2008, the administrative law judge issued a decision finding that Grable was not disabled within the meaning of the Act.  (R. 15-23.)  On June 29, 2010, the Appeals Council denied Grable's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 7.)  Grable thereupon filed this appeal.

**Age, Education, and Work Experience**.  Grable was born August 20, 1966.  (R. 780.)  He completed high school, though he informed one physician that he had withdrawn from school due to bullying and been home schooled after the ninth grade.  (R. 745.)  He completed "just about a year of college".  (R. 781.)  He has been employed as an emergency room technician, EMT, maintenance man, carpet salesman, forklift operator, and wire harness assembler.  (R. 781-87.)  The ALJ questioned Grable at the hearing about a five-month period of employment as an emergency room technician after his date of disability onset.  (R. 784-85.)  Grable

testified that he had attempted to return to work, but that his employer, Good Samaritan Hospital, would not cooperate with him with accommodate his classroom schedule to obtain medic's training. (R. 784.)

**Plaintiff's Testimony**. The administrative law judge summarized Grable's testimony at the hearing as follows:

> The claimant testified that he could not work a full workweek any longer because his "nerves are bad." He explained that he experiences weekly migraine headaches, he is bipolar, he has anxiety problems, and he has hypertension, which is controlled. He had been having gallbladder attacks until his gallbladder was removed in September 2004. During the period before it was removed, however, he said he became addicted to his pain medicine. The claimant also complained of anhedonia, trouble concentrating, and panic attacks. He said that he was "high strung" and that some days he did not bathe, shave, or even get dressed. He has had some counseling and he takes Prinivil, Lamictal, Trazodone, Topamax, and Tylenol, although they make him sleepy.
>
> The claimant acknowledged that he has no exertional limitations, except that (prolonged) sitting makes him "antsy." He drives a car locally, occasionally. He said he rises at 9:00 and bathes, shaves, and gets dressed "when he feels like it." He does not cook or wash dishes, but he reads the Bible and watches television. He does not go to restaurants or movies, and he does not play cards or board games, but he does go to church once a week. He visits friends and relatives, and he does not drink or smoke. His three (grown) children have been a big support in the last few months, and he gets along fine with his wife. However, he continued, he has a problem with anxiety and he is high strung, edgy, nervous, and cranky. He gets panic attacks and headaches weekly. On a good day, he might mow the lawn. If a bad day, he will stay in bed. He concluded that he could not work 40 hours a week because he gets really confused and agitated.

(R. 21-22.)

**Medical Evidence of Record**.

Although the administrative law judge's decision fairly sets forth the relevant

3

medical evidence of record, this Report and Recommendation will summarize that evidence in some detail.

### Mental Impairments.

<u>Lee E. Roach, Ph.D.</u> On November 26, 2005, Dr. Roach, a psychologist, conducted a consultative psychological examination. Grable reported to him that he had suffered from several different problems, including anger management, stress, and anxiety. He stated that he was diagnosed with clinical depression in 2001. (R. 168.) Grable reported that he had been separated from his wife in 2002 as a result of an explosive episode, and that although they had gotten back together he was beginning to have problems controlling his anger again. (R. 170.) Dr. Roach conducted intelligence testing, with average results. (R. 172.) He also conducted the Minnesota Multiphasic Personality Inventory-2 (MMPI-2). (R. 173.) This produced a result of "a valid profile that reflected evidence of a formal thought disorder" although Grable "does not appear to be psychotic." (R. 173.)

Dr. Roach concluded that Grable had the mathematical skills to manage his funds but not the emotional stability to do so due to depression and anxiety. (R. 174.) He opined that Grable's ability to remember, understand, and follow instructions, to maintain attention, to sustain concentration at tasks, to undertake social interactions, and to adapt to new situations were moderately impaired, and that his ability to respond properly to the pressures involved in simple or repetitive tasks was markedly impaired. He diagnosed major depressive disorder, moderate to severe, without psychotic features, recurrent without interepisode recovery, a

4

pain disorder associated with both psychological factors and a general chronic medical condition, and an intermittent explosive disorder. (R. 174.)

In a written evaluation, Dr. Roach concluded that Grable's evaluation confirmed his difficulty in controlling his anger episodes, and that his MMPI-2 profile highlighted schizophrenia and social introversion. (R. 177.) Dr. Roach opined that Grable was employable and that his limitations were expected to last between nine and eleven months.

Billy R. Hunter, M.D.  On January 31, 2006, Grable visited Dr. Hunter at the Six County medical center for an initial psychiatric evaluation. (R. 449.) Grable reported that he had been referred for evaluation in conjunction with his concerns about a possible bipolar mood disorder, and recent incidents of speeding tickets, impulsive spending, and excessive thoughts. He also reported that he had been started on pain medications after a cholecystectomy, and that he was concerned that his body was becoming too accustomed to the medication. Grable complained of mood swings, irritability, and agitation, with mood swings from depression to mania.

Dr. Hunter noted that Grable was oriented times four, and that his mood showed some underlying depression rather than manic symptoms. (R. 450.) Grable reported no suicidal or homicidal ideations, no overt evidence of psychosis, and fair judgment and insight. Dr. Hunter's diagnosis was Bipolar I Disorder, with his most recent episode severe depression without psychotic features. Dr. Hunter assessed his GAF at 50. His recommendations were for Grable to continue taking Effexor

5

and Topamax, to add Lamictal, and to report in two months for a follow-up. (R. 450.)

Grable continued to see Dr. Hunter on several occasions between January 2006 and November 2006. In March 2006, he reported that he had been doing much better on his new combination of medications, and Hunter noted that Grable had no overt depression and reported no suicidal or homicidal ideations. (R. 445.) In June 2006, Grable returned, reporting that he had been depressed for the last couple weeks and had suffered some anxiety and irritability. (R. 744.) Dr. Hunter observed that he seemed dysthymic and dysphoric, with depressive thinking and hesitation. He was given a prescription for a new medication, Klonopin. (R. 744.)

In August 2006, Grable returned to see Dr. Hunter. He reported still suffering some anxiety and depression. Hunter observed that Grable had a depressed mood and affect. He altered Grable's medications. (R. 743.) In December 2006, Grable reported that "things have been going fine" and that he had generally "been on an even keel". Hunter altered Grable's medications again. (R. 742.) Grable saw Hunter again in February, July, and December 2007. In February 2007 Hunter noted that Grable seemed a bit depressed, and altered his medication. (R. 739.) In July 2007 Grable reported that he was doing well and was stable on his medications. (R. 740.) In December 2007 Grable reported that he had not been sleeping well due to family stress, and that he was still very depressed at times. (R. 739.)

<u>Todd Finnerty, Ph.D.</u> On February 16, 2006, Dr. Finnerty, a state agency

6

psychologist, conducted a review of Grable's record. (R. 422-439.) Dr. Finnerty opined that Grable suffered from major depression, anxiety, intermittent explosive disorder, and possible narcotic addiction. He concluded that Grable's allegations concerning his symptoms were credible, but specifically noted that hospital reports from Grable's numerous pain-related ER visits reflected concerns about narcotic-seeking behavior or narcotic addiction, and that they reported that his wife had similar concerns. (R. 438.)

Dr. Finnerty, apparently reviewing Dr. Roach's report, gave his conclusions of moderate impairment little weight, finding them not supported by the available evidence, and opined that Grable did not evidence any significant psychotic disorders or decompensation. He determined: "The clt retains the capacity to perform a wide range of tasks in settings with superficial interactions with others where duties are relatively static and any changes can be explained." (R. 438.) Dr. Finnerty specifically concluded that Grable had moderate limitations in maintaining social functioning, concentration, persistence, or pace, and mild limitations on activities of daily living. (R. 432.) With respect to vocational abilities, Grable had moderate limitations in his ability to maintain attention and concentration for extended periods, to perform activities within a regular attendance schedule, and to work in coordination with others without being distracted. (R. 436.) He also had moderate limitations in his ability to interact appropriately with the general public, to accept instructions and criticism from supervisors, to get along with coworkers without distracting them, and to respond

appropriately to changes in the work setting. (R. 437.)

Floyd Sours, M.A. On December 19, 2007, Mr. Sours, a consulting psychologist, performed a psychological evaluation of Grable at the request of a state disability determination agency. (R. 745.) Grable reported that he had depression and anxiety and claimed to be bipolar. He stated that he had been to counseling off and on for the last seven years at Six County, and that he had made two suicide attempts. Grable stated also that his wife had reported that he had begun to suffer memory problems three years prior, although a physician at Six County had told him that Topamax, one of his medications, could affect memory.

According to Grable, he had problems in high school and had been home schooled from the tenth grade forward. (R. 745.) He had last worked an E.R. technician at Licking County Hospital in 2005, but didn't make it through the initial training. However, he reported having worked at a different hospital, Grace Samaritan, for three and a half years as an E.R. technician. He was fired for missing work due to medical problems. (R. 746.)

Mr. Sours noted that Grable was oriented in all four spheres and coherent and alert throughout the interview. No memory problems were apparent. (R. 746.) Grable exhibited a minimal range of emotion, and stated that he had been depressed constantly for the last two weeks. He claimed that he had suffered withdrawal, poor concentration, anhedonia, fatigue, and irritability. Sours administered the Wechsler Adult Intelligence Scale, with average results, and the Bender Gestalt test, which showed very high results for copying and high average

for past recall. (R. 747.) Sours also conducted the MMPI-2, which he opined demonstrated a neurotic condition, and the Rorschach Test, which he opined suggested depression and a generally neurotic person. (R. 747.)

On review, Sours diagnosed a bipolar disorder with a depressed type, and stated that Grable had a GAF of 55 and seemed to be functioning marginally at present. (R. 748.) Sours noted that Grable had stated during the interview that he had problems with his memory, but that he had seen no indications of it. He concluded that Grable had the ability to understand follow instructions, as well as to maintain sufficient attention to perform simple repetitive tasks. Grable should be able to relate to coworkers and supervisors in an employment setting. However, Sours opined that Grable had a bipolar disorder diagnosed whose symptoms would intensify under the stress, and recommended a thorough medical assessment. (R. 748.)

Sours also completed a form medical evaluation. (R. 749-50.) In it, he opined that Grable had mild limitations in his ability to understand and remember simple instructions, carry out simple instructions, and make work-related judgments. Grable had moderate limitations in his abilities to understand and remember complex instructions, carry out complex instructions, make judgments on complex work decisions, interact appropriately with the public, supervisors, or co-workers, and respond appropriately to usual work situations and changes in routine.

<u>Thomas R. Vajen, M.D.</u> On March 21, 2008, Dr. Vajen, a physician at Six County, completed a form mental residual functional capacity questionnaire. (R.

9

766-68.)  He stated that Grable had marked limitations in every category of social, vocational, and adaptive functioning, except his ability to maintain personal appearance and hygiene, in which he had moderate limitations.  Dr. Vajen opined that Grable's condition was likely to deteriorate if he were placed under stress, and that his impairment had or was expected to last more than twelve months.

In addition, on May 8, 2008, Dr. Vajen wrote a letter "to whom it may concern", stating that Grable was unable to work a normal workday or workweek because he had a bipolar disorder for which he had required hospitalization.  Dr. Vajen asked that the state disability determination agency "strongly consider him for disability." (R. 763.)

**Administrative Law Judge's Findings**.  The administrative law judge found that Grable had impairments of intermittent explosive disorder and a somatoform disorder vs. drug seeking behavior, which together were severe and substantially compromised his ability to perform basic work functions. (R. 17.)  He noted that Grable had engaged in some substantial gainful activity after the alleged onset date.  The ALJ determined specifically that Grable had a moderate restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with respect to concentration, persistence or pace.  He restricted Grable to unskilled work. (R. 19.)

At the hearing, the vocational expert testified that, given Grable's restrictions, he could still perform his past relevant work as an assembler of wire harnesses, which was light, unskilled labor.  Accepting that testimony, the ALJ

determined that Grable was not disabled.  (R. 22-23.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It means "'more than a scintilla.'" *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6thCir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6thCir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6thCir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6thCir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6thCir. 1985).

**Plaintiff's Arguments**.  Plaintiff argues that: (1)  the ALJ failed to state what weight he gave to the opinion of Dr. Vajen, and instead rejected his opinion without analysis; (2) the ALJ failed to address treatment notes from Six County that provide a clinical record of Grable's mental impairments; (3) the ALJ failed to mention or address the consulting examination report of Dr. Roach; (4) the ALJ used an improper definition of "moderate"; and (5) the ALJ improperly refused to

conduct a supplemental hearing.

### Analysis.

I. ALJ's Review of Medical Evidence.

Grable first argues that the ALJ failed to give proper weight to the opinion of Dr. Vajen. As Grable points out, an ALJ must give good reasons for rejecting the opinion of a treating physician. *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988). Moreover, there is a rebuttable presumption that a treating physician's opinion is entitled to great deference. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6thCir. 2007). Grable argues that the ALJ's failure to give proper consideration to the opinions of Dr. Vajen that he suffered marked impairment in several different areas of activity was prejudicial and rendered his decision not supported by substantial evidence.

However, as the Commissioner points out, there is no evidence in the record to demonstrate that Dr. Vajen was a treating source at all. The ALJ accurately set forth Dr. Vajen's record, which consisted in its entirety of his "to whom it may concern" letter and his form mental residual capacity questionnaire. The ALJ concluded that "[n]o treatment notes were submitted to support his 'marked' ratings." (R. 20.) There is no evidence as to how often or how long Vajen saw Grable, or whether there was simply a single consultation. Furthermore, while a treating physician's opinion is entitled to controlling weight, this is true only when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case

12

record".  20 C.F.R. § 404.1527(d)(2).  Such an opinion must have "sufficient data to support the diagnosis."  *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  Grable has made no allegation as to the length of his treating relationship with Dr. Vajen, and the evidence of record does not demonstrate that such a relationship existed.  No treatment notes or records of consultations appear.  Consequently, I cannot find that the ALJ erred in failing to give weight to Dr. Vajen's report.

Grable argues also that the ALJ failed generally to address his treatment record from Six County – namely, the notes of Dr. Hunter, and his initial psychiatric evaluation and subsequent follow-up evaluations and diagnoses.  He is correct that the ALJ does not refer to Dr. Hunter, and does not explicitly address either his treatment history or Dr. Hunter's diagnoses.[1]  Dr. Hunter, according to the medical record, treated Plaintiff's mental impairments for an extended period of time, having administered an initial examination and conducted numerous follow-ups over a period of almost two years, including the prescription and adjustment of medications.  The absence of an analysis of Dr. Hunter's treatment records is therefore a substantial deficiency in the ALJ's opinion.

The Social Security Administration "promises claimants that ALJs 'will evaluate every medical opinion [they] receive.'"  *Smith v. Comm'r of Social Security*,

---

[1] The Commissioner points out, correctly, that the ALJ cited directly to Dr. Hunter's notes.  (R. 19, citing 739-40.)  Nevertheless, this oblique reference to Grable's education plans did not provide the consideration of Dr. Hunter's reports that the Commissioner's regulations require.

13

482 F.3d 873, 875 (6th Cir. 2007), quoting 20 C.F.R. §404.1527(d). The ALJ can, of course, assign different weight to different evidence in the record (subject to certain constraints as to the differences amongst various sources). However, it is axiomatic that, as his job is to resolve conflicts in the evidence, he must present and address the medical record. A reviewing court cannot determine whether the ALJ carried out his obligation to consider the record as a whole unless the ALJ shows that he did. An ALJ's failure to give "good reasons" for his rejection of medical evidence is grounds for remand even if substantial evidence would otherwise support his decision. *Hall v. Comm'r of Social Security*, 148 Fed. Appx. 456, 461 (6th Cir. 2005), citing *Wilson v. Comm'r of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement that ALJs articulate reasons for crediting or rejecting particular sources of evidence "is absolutely essential for meaningful appellate review." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984). Consequently, remand is appropriate for the ALJ to analyze and explain the weight he gives to Dr. Hunter's medical opinions.

  Finally, Grable argues that the ALJ erred in failing to mention or address the November 26, 2005 examination of Dr. Roach. He asserts that Dr. Roach's findings establish a greater severity of mental impairment than the ALJ eventually found, and that the ALJ had a duty to address and evaluate all examining medical sources. Again, Grable is correct that the ALJ's opinion does not address, or even refer to, Dr. Roach's examination. The Commissioner rejoins that Dr. Roach concluded that Grable was employable and that his functional limitations would not

last longer than eleven months, which is too short a period to qualify as a disabling impairment. 42 U.S.C. §§423(d)(1)(A). Nevertheless, it was for the ALJ to explain how much weight he gave to Dr. Roach's examination opinion.[2] Remand is appropriate for the ALJ to properly address Dr. Roach's November 2005 opinion.

    II.    <u>ALJ's Hearing and Post-Hearing Actions</u>.

At the hearing, the ALJ presented a hypothetical question concerning Plaintiff's residual mental functional capacity to the testifying vocational expert. It asked the expert to consider Mr. Sours' functional capacity opinion, and included a definition of "moderate" impairment:

> Q.    Dr. Klein, I'll ask you a hypothetical question. [. . .] Assume also that he has the mental residual functional capacity found at Exhibit 67F. For definitional purposes, assume the term moderate means there's more than a slight limitation in the area, *but the individual is still able to function satisfactorily*. Assume that the Claimant is moderately limited in his ability to understand, remember complex instructions, carry out complex instructions, make judgment on complex work-related decisions, interact appropriately with the public, with supervisors, and co-workers, respond appropriately to usual work situations and changes in a routine work setting. Under this hypothesis, could the Claimant return to any of his past relevant work?

(R. 798, emphasis added.) Grable objects that, in this, "the ALJ crafted his own definition" of "moderate", which, by implication, permitted "only two possible levels of limitation for any given area: 'none' and 'disabled.'" (Doc. 15 at 18.)

---

[2] Dr. Roach's opinion on Grable's employability is not entitled to any special deference, as it was on a matter reserved to the Commissioner. 20 C.F.R. §404.1527(e). Still less can the Court apply such opinion in order to find that it was unnecessary for the ALJ to address this examining source.

Grable is correct. The level of "moderate" on Mr. Sours' form questionnaire (to which the vocational expert's attention had been addressed) is one step greater in severity than "mild". However, the definition of "mild" given is "impairment limits, but claimant *could function satisfactorily* in a work setting". (R. 769.) This is substantially the same as the ALJ's "more than a slight limitation . . . but the individual is still able to function satisfactorily." "Moderate" impairment is defined as "impairment would noticeably affect *but not totally preclude ability* to function". The ALJ's hypothetical question to the vocational expert erroneously defined "moderate" in the terms properly used for "mild", and upon remand any similar question addressed to a vocational expert should use terms similar to the "moderate" definition found on the Agency forms utilized by Mr. Sours and Dr. Vajen.

Finally, Grable states that, in June 27, 2008 correspondence from the ALJ to his counsel, the ALJ stated that counsel could request a supplemental hearing for new testimony and evidence, and that if such request were made, the ALJ "will grant the request unless I receive additional records that support a fully favorable decision." (R. 806.) However, when counsel made such request, the ALJ made no direct reply, but instead stated in his opinion:

> At the close of the hearing, the claimant's attorney, Mr. Farrell, requested that a Mental Residual Functional Capacity assessment form created by him be submitted to the consultative examiner, Mr. Sours, for completion. I cooperated and requested that the State Agency submit this form to Mr. Sours, which they did. The completed form was returned by the psychologist and is found at Exhibit 72F. The attorney then requested that a supplemental hearing be held, with

16

> a vocational expert, arguing that the second MRFC form is substantially different from the first one, which was completed by the same consulting psychologist. I disagree, and reject that request for another hearing.

(R. 20.) Grable does not argue, however, that the ALJ was required by statute or regulations to grant such request, but instead asserts that "[t]his action, along with the definition of 'moderate' imposed upon the VE, demonstrate that the ALJ was unwilling to fully develop the record in this case, and was unwilling to entertain a possible finding of disability". (Doc. 15 at 19.) This is not an argument that the ALJ failed to apply the law, or that he abused his discretion, but rather that he was biased against the claimant. As Grable has presented no evidence or further basis to support a claim of bias against the ALJ, other than that he issued an unfavorable ruling, I will disregard this argument.

Therefore, I find that the ALJ erred in failing to address and analyze the medical evidence of the consultative examiner, Dr. Roach, and Grable's treating physician, Dr. Hunter, and that he erred in providing an incorrect definition of "moderate" impairment to the testifying vocational expert. I do not find that the ALJ erred in failing to give greater weight to the opinion of Dr. Vajen or in failing to grant Grable a supplemental hearing. I accordingly **RECOMMEND** that this matter be **REMANDED** to the administrative law judge for further proceedings.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the

17

party thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgement of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6thCir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.3d 15, 16 (2d Cir. 1989).

s/Mark R. Abel<br>
United States Magistrate Judge